IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHARLA R. MCDANIEL, | ) | CASE NO. 3:14CV551 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Sharla R. McDaniel ("McDaniel") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

A set forth more fully below, the Administrative Law Judge ("ALJ") failed to explain his Step Three finding that McDaniel's impairments did not meet or medically equal a Listing. Accordingly, the Commissioner's decision is **REVERSED and REMANDED**.

**I. Procedural History**

McDaniel protectively filed an application for DIB on January 13, 2011, alleging a disability onset date of April 19, 2010, and a date last insured of December 31, 2014. Tr. 148, 162. She alleged disability based on the following: "L3 L4 verte[]brae injured" and "pschiatic [sic] nerve pain[]." Tr. 166. After denials by the state agency initially (Tr. 51) and on reconsideration (Tr. 63), McDaniel requested an administrative hearing. Tr. 79. A hearing was

1

held before Administrative Law Judge ("ALJ") Timothy C. Scallen on September 28, 2012. Tr. 24-42. In his November 2, 2012, decision (Tr. 10-16), the ALJ determined that there were jobs that existed in significant numbers in the national economy that McDaniel could perform, i.e., she was not disabled. Tr. 15. McDaniel requested review of the ALJ's decision by the Appeals Council (Tr. 6) and, on January 17, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

McDaniel was born in 1967 and was 43 years old on the date her application was filed. Tr. 162. She completed twelfth grade. Tr. 166. She previously worked as a cook, a dishwasher, and in nutrition services. Tr. 167. She last worked in April 2010. Tr. 167.

### B. Medical Evidence

On January 15, 2010, McDaniel saw George R. Kaftan, D.O., at Northern Ohio Medical Specialists ("NOMS"). Tr. 271. She complained of back pain and abdominal discomfort. Tr. 271. She rated her back pain nine on a ten-point scale. Tr. 271. Upon examination, Dr. Kaftan noted that McDaniel was in no apparent distress. Tr. 272. She had tenderness in the area of her left rib and Dr. Kaftan ordered an x-ray of her left rib. Tr. 273.

On February 11, 2010, McDaniel went to NOMS and saw Carrie Collins, a certified nurse practitioner (CNP). Tr. 250-252. McDaniel complained of pain in her left flank radiating into her abdomen. Tr. 250. She described her pain as an ache and rated it a nine in severity. Tr. 250. Standing, twisting, walking and bending aggravated her symptoms. Tr. 250. She denied "any relieving factors." Tr. 250. She stated that she felt like she had kidney stones. Tr. 250. Upon examination, Collins observed that McDaniel was uncomfortable. Tr. 251. Collins

prescribed new medications and advised McDaniel to go to the emergency room if her symptoms worsened.  Tr. 251.

On February 21, 2010, McDaniel presented to the emergency department complaining of right sacroiliac pain "going into her leg."  Tr. 274.  The pain was intermittent and occurred primarily when she moved.  Tr. 274.  Upon physical examination, straight leg testing of her left leg was ninety degrees and her right leg was seventy degrees.  Tr. 275.  She had normal reflexes in her lower extremities and her spine was not tender when palpated.  Tr. 275.  McDaniel exhibited pain when sitting forward.  Tr. 275.  She had blood in her urine.  Tr. 275.  X-rays of her lumbosacral spine were normal.  Tr. 275.

On February 24, 2010, McDaniel saw Collins again.  Tr. 247.  She reported back pain radiating to her right thigh.  Tr. 247.  She described the pain as an ache, shooting and stabbing.  Tr. 274.  Her symptoms were relieved by medication.  Tr. 247.  Upon physical examination, Collins noted that McDaniel was not in apparent distress and that her back and spine revealed no abnormality.  Tr. 248.

On March 4, 2010, McDaniel underwent a cystoscopy, retrograde pyelogram, ureteral dilation and ureteroscopy.  Tr. 368-369.  Patrick Waters, M.D., diagnosed her with right flank pain, hematuria and urethritis.  Tr. 368.  Dr. Waters' impression was that McDaniel passed a ureteral calculus and that this may have been the entire cause of her pain.  Tr. 369.

On March 6, 2010, McDaniel had an MRI study of her lumbar spine performed.  Tr. 362.  The MRI revealed mild disc space narrowing at the L3-L4 vertebrae and small posterior disc bulges at the L3-L4 and L5-S1 vertebrae.  Tr. 362.  There was no sign of central spinal canal stenosis, lateral recess narrowing, or neural foraminal narrowing, and her paraspinal soft tissue was unremarkable. Tr. 362.

On April 14, 2010, McDaniel saw Brendan W. Bauer, M.D. Tr. 528-333. McDaniel complained of a bulging disc with pain radiating down her right hip. Tr. 528. She rated her pain as a ten out of ten. Tr. 528-333. Upon examination, Dr. Bauer observed that she was in no acute distress. Tr. 529. She walked with a normal gait. Tr. 530. She had decreased sensation in her right lower extremity and signs of tenderness in her lumbar paraspinal region. Tr. 530. Dr. Bauer recommended a trial of physical therapy. Tr. 531.

On April 27, 2010, McDaniel went for a physical therapy evaluation. Tr. 442. She rated her pain as ranging from five to ten on pain scale of ten. Tr. 442. She had moderate tightness over her bilateral sacroiliac joint and buttock region. Tr. 442. She had a decreased range of motion in her trunk. Tr. 442. She reported difficulty carrying out functional activities such as "rolling in bed, transfers, walking, standing," and using stairs. Tr. 442.

On June 10, 2010, an EMG study was done on McDaniel's left arm. Tr. 523. The study revealed an "ulnar neuropathy at the left elbow segment which is axon loss in type and moderate in degree electrically" and mild carpal tunnel in McDaniel's wrist.[1] Tr. 523.

McDaniel attended ten of twelve physical therapy sessions; her last session was on June 4, 2010. Tr. 444. At that time she reported mild aching and her pain had decreased to a three or four out of ten. Tr. 444. The physical therapist noted that McDaniel had "established a core exercise program with fair tolerance and did experience good relief with prone exercises." Tr. 444. McDaniel was discharged at the end of July. Tr. 444.

On July 8, 2010, McDaniel saw Dr. Bauer. Tr. 518-521. She reported that her pain was five out of ten. Tr. 518. She complained of back pain, joint pain, muscle cramps and weakness. Tr. 519. She saw Dr. Bauer again on October 27, 2010. Tr. 509-513. She complained of

---

[1] The record contains further evidence of McDaniel's ailments pertaining to her arm. These records are not material to the Court's determination in this case and, therefore, are not discussed in their entirety.

4

radiating lumbar back pain. Tr. 509. She described her pain level as five out of ten. Tr. 509. Dr. Bauer observed that she was not in acute distress and walked with a normal gait. Tr. 510. He recommended an epidural injection. Tr. 512. On November 5, 2010, December 3, 2010, and January 5, 2011, McDaniel received a lumbar epidural nerve block. Tr. 410-411, 492-493. On a visit with Dr. Bauer on December 22, 2010, McDaniel reported more pain in her back, hip, leg and buttocks. Tr. 407.

On March 14, 2011, McDaniel reported to Dr. Bauer that her arm and back pain got worse with any kind of bending or twisting movements and that she was unable to carry a gallon of milk. Tr. 488. Upon examination, McDaniel was not in acute distress, walked with a normal gait and had full strength in her extremities. Tr. 488-490. She had decreased sensitivity in her right leg and left arm. Tr. 489. Straight leg raise testing was negative. Tr. 490. Dr. Bauer wrote, "[s]he is operating at the less than sedentary level and remains disabled at this time." Tr. 490.

On August 11, 2011, another MRI was performed on McDaniel's lumbar spine. Tr. 536-537. The MRI showed moderate disc narrowing at her L3- L4 vertebrae and a mild far posterolateral disc protrusion with encroachment of her right L3-L4 neuroforamen. Tr. 537. It revealed mild focal disc protrusion with encroachment at her L4-L5 vertebrae and slight annular bulging and minimal anterior indentation of her thecal sac. Tr. 537. She also had mild central annular bulging at her L5-S1 vertebrae with mild anterior indentation of her thecal sac. Tr. 537.

On November 30, 2011, McDaniel had an MRI of her right knee. Tr. 534-535. The MRI showed a tear of her superior articular surface and anterior horn of her lateral meniscus and degenerative type signal changes in her medial meniscus without definite medial meniscal tear. Tr. 535. It revealed no ligamentous injury or acute bony abnormality but showed minimal

marginal osteophyte formation in all compartments of her knee and a very small popliteal cyst. Tr. 534-535.

On November 25, 2011, McDaniel saw Timothy R. Lynch, D.O., at NOMS for evaluation of her right knee.  Tr. 541-544.  She reported problems with bent knee activities.  Tr. 541.  Upon examination, she had an antalgic gait and favored her right knee.  Tr. 543.  Dr. Lynch noted that McDaniel did not like to fully extend her right knee but that she was able to actively raise it.  Tr. 543.  He found that the primary tenderness was along the medial joint line and medial meniscus.  Tr. 543.  He diagnosed McDaniel with mild to moderate degenerative joint disease and a probable underlying meniscus tear.  Tr. 543.

McDaniel saw Dr. Lynch again on December 16, 2011.  Tr. 538-540.  She reported persistent symptoms in her right knee.  Tr. 538.  Dr. Lynch again noted that McDaniel ambulated with an antalgic gait and that she had "some mild" crepitus and mild joint effusion. Tr. 539.  Her range of motion was intact.  Tr. 539.  Dr. Lynch diagnosed right knee mild to moderate degenerative joint disease with meniscus tear and recommended injection therapy.  Tr. 540.

On December 20, 2011, McDaniel saw Dr. Bauer complaining of back pain radiating to her right leg.  Tr. 565-570.  McDaniel rated her pain a nine out of ten.  Tr. 565.  Upon examination, Dr. Bauer observed that she was not in acute distress and that she walked with a normal gait.  Tr. 566-567.  Straight leg raise testing was negative bilaterally and McDaniel had decreased sensation in her right leg and left arm.  Tr. 567-568.  Dr. Bauer prescribed a quad cane. Tr. 569.

On March 7, 2012, McDaniel returned to Dr. Bauer's office and saw Kathleen Stierwalt, a family nurse practitioner, complaining of back and right leg pain.  Tr. 558- 564.  McDaniel reported "more pain than ever before."  Tr. 558.  Her medications did not relieve her pain.  Tr.

558. Upon examination, Stierwalt observed that McDaniel was in no acute distress and walked with a normal gait. Tr. 560-561. She had full strength in her biceps, triceps, and hamstrings and her sensation was intact. Tr. 561. Stierwalt recommended physical therapy. Tr. 561.

On June 20, 2012, McDaniel saw Dr. Bauer. Tr. 552. She rated her back pain as eight out of ten. Tr. 552. She reported that she had pain when she stood for more than two to three minutes and when she sat for more than fifteen minutes. Tr. 556. She stated that lying down helped alleviate her pain. Tr. 556. Dr. Bauer observed that McDaniel was in no acute distress and that she walked with a normal gait. Tr. 554-555. He opined that she was operating at less than sedentary level and that she would need to remain off work due to her pain level and dependence on medication for proper pain control. Tr. 556. He recommended physical therapy. Tr. 556.

On July 11, 2012, McDaniel saw Elizabeth M. Gomes for a right knee injection.[2] Tr. 596-597. McDaniel had moderate swelling in her right knee but full range of motion and no joint laxity. Tr. 596-596. She received an injection in her right knee. Tr. 596.

On August 22, 2012, McDaniel saw Stierwalt complaining of back and leg pain. Tr. 600-604. McDaniel was in no acute distress and she walked with a normal gait. Tr. 602-603. Stieralt noted that McDaniel had not pursued physical therapy. Tr. 603. Stieralt diagnosed McDaniel with lumbar degenerative disc disease and lumbar radiculopathy.

### C. Medical Opinion Evidence

#### 1. Dr. Kuns

On May 3, 2010, Burt Kuns, D.O., examined McDaniel and completed a Physician's Report of Work Ability.[3] Tr. 545-546. Dr. Kuns opined that McDaniel could occasionally lift

---

[2] The treatment note does not provide a professional title for Gomes. Tr. 596-597.
[3] The form is a workman's compensation form. Tr. 546.

and/or carry up to ten pounds and could occasionally stand, walk and sit. Tr. 546. He found that McDaniel had no ability to lift over ten pounds, bend, twist, turn, reach below her knee, push, pull, squat, kneel, and lift above her shoulders. Tr. 546. He wrote that McDaniel had a "sedentary work capacity." Tr. 546.

### 2. State Agency Reviewers Drs. Gardner and McCloud

On February 24, 2011, Edmond Gardner, M.D., a state agency physician, reviewed McDaniel's medical record. Tr. 46-50. Regarding McDaniel's residual functional capacity ("RFC"), Dr. Gardner opined that McDaniel could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand and/or walk a total of six hours in an eight-hour workday; could sit a total of six hours in an eight-hour workday; was unlimited in her ability to push and pull; could occasionally climb ramps, stairs, ladders, ropes and scaffolds; could occasionally stoop, kneel, crouch and crawl; had an unlimited ability to balance; and should avoid all exposure to hazardous machinery and heights. Tr. 47-48.

On May 23, 2011, W. Jerry McCloud, M.D., a state agency physician, reviewed McDaniel's medical record. Tr. 57-60. Dr. McCloud adopted most of Dr. Gardner's opinion, but did not impose environmental restrictions and added the following manipulative limitations: frequently fine and gross handling and fingering bilaterally. Tr. 58-59.

### D. Testimonial Evidence

#### 1. McDaniel's Testimony

McDaniel was represented by counsel and testified at the administrative hearing. Tr. 25-39. She testified that she lives with her twenty-six-year-old son in a one-story house. Tr. 31-32. She graduated from high school. Tr. 25. She last worked in April 2010 as a dietary aide at a

hospital. Tr. 25. She worked there for six years but left because her back began to hurt. Tr. 25-26. She testified that she is prevented from working because of her radiating back pain. Tr. 26.

McDaniel stated that, on a scale of zero to ten, her back pain is "sometimes ten or over." Tr. 26. She feels the pain "all the time" down both legs but primarily down her right leg. Tr. 26-27. She also feels tingling and numbness in her legs and her buttock, which causes her to limp. Tr. 28. She stated that she suffers no other symptoms. Tr. 28.

McDaniel testified that she takes medications for her pain and that they help "some." Tr. 29. She can lift ten pounds, can sit for ten to fifteen minutes at a time, and can stand on average ten to fifteen, and sometimes twenty, minutes at a time. Tr. 29-30. When she is sitting she has to get up and stretch or lie down for seven to fifteen minutes. Tr. 29. She can walk two or three city blocks depending on whether she is having a good day or a bad day. Tr. 30. When she is having a bad day she stays in bed most of the day. Tr. 30. She has bad days three or four days a week. Tr. 30. She uses a cane to walk in order to support her back. Tr. 27.

McDaniel stated that she can reach out with her arms but cannot grasp or hold things with her right hand because of a problem with her wrist. Tr. 31. She cannot climb stairs very well and cannot stoop, kneel, crouch or crawl. Tr. 31. She can bathe and dress herself and she can do household chores. Tr. 32. There are days when she cannot do things; she stated that physical activities aggravate her pain. Tr. 32, 34. To relieve her pain, she lies down and uses an ice or a heat pack. Tr. 34. She drives and she goes to the grocery store. Tr. 33. Her average day is spent "sitting around the house," "maybe" visiting her mother, and watching television. Tr. 33.

McDaniel also stated that she experiences knee pain "every single day" and that wearing a knee brace and refraining from stooping and bending relieves her pain. Tr. 36. She wears a knee brace two or three times a week when her knee hurts. Tr. 37-38. She also stated that she

9

uses the cane when she feels like her legs are going to give out, but that she does not use the cane every day. Tr. 37.

### 2. Vocational Expert's Testimony

Vocational Expert Christian R. Barrett ("VE") testified at the hearing. Tr. 39-41. The ALJ discussed with the VE McDaniel's past relevant work as a prep cook and dietary aide. Tr. 39-40. The ALJ asked the VE to determine whether a hypothetical individual of McDaniel's age, education and work experience could perform the jobs she performed in the past if that person had the following characteristics: can perform light work, can occasionally push and pull with the right lower extremity, can occasionally climb stairs and ramps but not ropes, ladders and scaffolds, can occasionally balance, stoop, kneel, crouch and crawl, can frequently handle and finger, and must avoid concentrated exposures to unprotected heights and moving machinery. Tr. 40. The VE testified that the person could not perform McDaniel's past relevant work. Tr. 40. The ALJ asked the VE if there were any jobs that the individual could perform, and the VE answered that the individual could perform jobs as a cashier, hostess, housekeeper and usher (8,000 jobs in the regional economy).[4]

The ALJ asked the VE whether there were jobs that such an individual could perform if the work was limited to the sedentary level. Tr. 40-41. The VE answered that such an individual could perform jobs as an assembler, inspector, packager, and sorter (6,000 regional jobs). Tr. 41. The ALJ asked the VE what the jobs allowed with respect to work breaks and absenteeism. Tr. 41. The VE stated that the jobs would allow two fifteen-minute breaks, one in the morning and one in the afternoon, a thirty-minute break for lunch, and no more than fifteen unscheduled absences a year. Tr. 41. The ALJ asked the VE whether the hypothetical individual would be

---

[4] Although the VE did not specify, the Court assumes that the number of jobs identified by the VE includes the total number of all named jobs: cashier, hostess, housekeeper and usher.

10

precluded from work if the individual was unable to comply with these expectations. Tr. 41. The VE answered that such an individual would be precluded from work. Tr. 41.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

11

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his November 2, 2012, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through the date of this decision.  Tr. 12.

2.  The claimant has not engaged in substantial gainful activity since April 29, 2010, the alleged onset date.  Tr. 12.

3.  The claimant has the following combination of severe and nonsevere impairments: degenerative disc disease in the lumbosacral spine with radiculopathy, a torn meniscus with degenerative changes in the right knee, and nonsevere fibromyalgia and carpal tunnel syndrome.  Tr. 12.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

5.  The claimant has the residual functional capacity to perform sedentary exertional work as defined in 20 CFR 404.1567(a) with frequent handling and fingering; occasional pushing and pulling with the right lower extremity; occasional climbing of stairs and ramps but no climbing of ropes, ladders, and scaffolds; occasional stooping, kneeling, crouching and crawling; and no concentrated exposure to unprotected heights or moving machinery.  Tr.13.

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

6. The claimant is unable to perform any past relevant work. Tr. 14.

7. The claimant is 45 years old, which is defined as a younger individual. Tr. 14.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 15.

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills. Tr. 15.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 15.

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 29, 2010, through the date of this decision. Tr. 15.

## V. Parties' Arguments

McDaniel objects to the ALJ's decision on two grounds. She argues that the ALJ failed to explain why he found that her impairments did not meet or medically equal a Listing.[6] Doc. 15, p. 11. McDaniel also asserts that the ALJ failed to give substantial weight to the opinions of her treating physicians when the ALJ determined that McDaniel was capable of performing sedentary work. Doc 15, p. 17. In response, the Commissioner submits that substantial evidence supports both the ALJ's determination that none of McDaniel's impairments meets or medically equals a Listing and the ALJ's finding that she could perform a reduced range of sedentary work.

## VI. Law & Analysis

---

[6] McDaniel asserted her sedentary work argument in the section of her brief regarding her argument that the ALJ failed to explain why her impairments did not meet or medical equal a Listing. Doc. 15, p. 10. Later, however, McDaniel articulates her sedentary work argument in the section of her brief related to her treating physician argument. *See* Docs. 15, p. 17; 19, p. 5. Because McDaniel's sedentary work argument is related to her treating physician argument, the Court considers these arguments together in the section below addressing McDaniel's treating physician argument.

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ failed to explain his Step Three determination

McDaniel contends that the ALJ erred in his Step Three determination because he gave only a conclusory, one-sentence statement with respect to whether McDaniel's impairments meet or medically equal a Listing.  Doc. 15, p. 11.  She argues that the ALJ's determination that she had "severe physical impairments in both her lumbar spine and right knee [ ] warrant at the least an explanation of why she does not meet the relevant listings (1.02 & 1.04)."  Doc. 15, p. 11.

Listing 1.02, major dysfunction of a joint, is

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> >
> > B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

14

20 CFR Pt. 404, Subpt. P, App. 1. Listing 1.04, disorders of the spine, is defined as

> herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture [], resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*

In considering whether McDaniel's impairments meet or equal a Listing, the ALJ stated, "The record does not contain the requisite clinical or objective findings that would meet or equal any Listings in Appendix 1, Subpart P, Regulations No. 4." Tr. 13.

The ALJ's conclusory statement is insufficient. The ALJ found that McDaniel had the following severe impairments: degenerative disc disease in the lumbosacral spine with radiculopathy, a torn meniscus with degenerative changes in the right knee, and nonsevere fibromyalgia and carpal tunnel syndrome. Tr. 13. McDaniel identified evidence suggesting that she could potentially satisfy the requirements for Listings 1.02 and 1.04. The ALJ should have provided an explanation as to why he found that she did not meet or equal these Listings. Without an explanation, the Court is unable to determine whether the ALJ's decision is supported by substantial evidence. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411,

416 (6th Cir. 2011) (failure of the ALJ to analyze whether claimant's physical impairments met or equaled a Listing at Step Three is error; "the ALJ needed to actually evaluate the evidence, compare it to [the Listing], and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence."); *see also Peshek ex rel. N.R. v. Comm'r of Soc. Sec.*, 2014 WL 5684386, at *13 (N.D.Ohio Nov. 4, 2014) ("Courts within this District have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful step three analysis that compares the medical evidence to the applicable Listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing," collecting cases).[7]

The Commissioner submits that "only a minimum articulation is required at step three" and cites *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985), in support. Doc. 18, p. 10. *Price* does not stand for the proposition that only a minimum articulation is required at Step Three. The court in *Price* merely stated, "[a]lthough the ALJ's findings of fact could have been stated with more particularity, we are not persuaded that his findings are legally insufficient." 767 F.2d at 284. Moreover, *Price* dealt with widow's disability benefits and the court specifically noted, "Our conclusion as to the adequacy of the findings and as to disability might well be different if claimant were a wage earner subject to the more liberal substantial gainful activity test." *Id*. Here, McDaniel is a wage earner, and *Price* is inapposite. *See Risner v. Comm'r of Soc. Sec.*, 2012 WL 893882, at *3 (S.D.Ohio March 15, 2012) (finding that *Price* is "entirely irrelevant" to the question of whether the ALJ provided sufficient analysis at Step Three). Finally, the ALJ's

---

[7] The court in *Peshek ex rel. N.R.* affirmed the Commissioner's decision because it found that the ALJ "considered each of the Listings individually" and "applied each of the standards to the medical evidence in the case." 2014 WL 5684386, at *17.

16

Step Three finding did not even constitute a "minimum articulation"—there was no articulation at all.

The Commissioner submits that the ALJ sufficiently explained why McDaniel failed to meet or equal a Listing elsewhere in his decision.  The Court is unable to determine, looking elsewhere in the ALJ's decision, whether the ALJ's decision at Step Three is supported by substantial evidence.  Moreover, an ALJ's failure to properly analyze at Step Three is not remedied by the conclusions reached by the ALJ at Steps Four and Five.  *See Reynolds*, 424 Fed. App'x at *4.

### B.  The ALJ did not err with respect to the treating physician rule

McDaniel argues that the ALJ erred by not giving substantial weight to the opinions of her treating physicians, Drs. Bauer and Kuns, and by failing to include their work limitations in his RFC assessment.  Doc. 15, p. 16-17.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *See* 20 C.F.R. § 404.1502.  The commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time

will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]" *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). The plaintiff has the burden of showing that a doctor is a treating physician. *See id*. at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source. *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

Here, there is no evidence that Dr. Kuns is a treating physician. The only item in the record McDaniel identifies pertaining to Dr. Kuns is Dr. Kuns' opinion, his Physician's Report of Work Ability, completed on May 3, 2010. Tr. 546. Because McDaniel has not shown that Dr. Kuns is a treating physician, his opinion is not entitled to controlling weight.[8] *See Kornecky*, 167 Fed. App'x at 506-508. Moreover, McDaniel's argument—that Dr. Kuns' opinion that she can never bend means that she can never stoop per the definition of "stoop" found in SSR 85-15; an inability to stoop would "usually" result in a finding of disability per SSR 96-9p—is without merit. SSR 96-9p does not compel a finding of disability when there is a limitation of no stooping, *see* SSR 96-9p, 1996 WL 374185, at *8, and, furthermore, the final responsibility for deciding the RFC is reserved to the Commissioner, s*ee* 20 C.F.R. § 416.927(d)(2).

Dr. Bauer opined that McDaniel "is operating at the less than sedentary level and remains disabled at this time." Tr. 490. McDaniel argues that the ALJ should have afforded substantial weight to Dr. Bauer's opinion that she was operating at less than the sedentary level. Doc. 15, p.

---

[8] At the hearing, McDaniel testified that she saw Dr. Kuns "only once." Tr. 36.

17. Whether a claimant is capable of sedentary work is an issue reserved for the Commissioner. *See Grider v. Comm'r of Soc. Sec.*, 2011 WL 1114314, *4 (S.D. Ohio March 25, 2011) (physician's "'sedentary' assessment was a conclusion on an issue reserved to the Commissioner," citing SSR 96-5p, 1996 WL 374183, at *5). Furthermore, the ALJ stated that he gave less than considerable weight to Dr. Bauer's opinion because it was "based largely on [McDaniel's] subjective complaints of pain," which the ALJ did not find fully credible. Tr. 14 (explaining that the medical testing, objective findings, and conservative treatment do not support the incapacitating symptoms described by McDaniel).

      McDaniel also claims that the ALJ failed to explain why the limitations assessed by Dr. Kuns were not supported by the evidence. Doc. 15, p. 19. The Court disagrees. Although the ALJ did not specifically recite all the limitations in Dr. Kuns' opinion—squatting, kneeling, pushing, pulling, reaching below the knee, twisting, turning, bending, and lifting above the shoulders—the ALJ discussed the evidence pertaining to McDaniel's back, knee and arm, and explained why this evidence supported his RFC assessment. Tr. 13-14 (discussing objective medical records and diagnostic testing and observing that the limitations found in the opinion evidence were largely derived from McDaniel's subjective complaints of pain, which the ALJ found not fully credible). Because the ALJ's RFC assessment is supported by substantial evidence, his RFC assessment is affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Dated: February 3, 2015

Kathleen B. Burke
United States Magistrate Judge